**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

STEPHEN ANTHONY RAO,

Plaintiff,

v. Case No. 2:25-cv-421 -KRH

COMMISSIONER OF SOCIAL SECURITY,

Defendant.
_____________________________/

# ORDER

At issue is Plaintiff Stephen Rao's appeal from a decision by Defendant Commissioner of Social Security. The Commissioner filed a transcript. (Doc. 10). And this appeal is fully briefed. (Doc. 11; Doc. 16; Doc. 18). The Court affirms.

## Social Security Disability Insurance ("SSDI") Benefits and Review

Disputes over denied SSDI benefits have multiple levels of review. Applicants first seek reconsideration. If unsuccessful, they proceed to a full hearing before an administrative law judge ("ALJ"). Should the ALJ issue an unfavorable decision, the applicant may appeal that determination to the Appeals Council. Finally, if all else fails, the applicant can seek review in federal court.

By the time SSDI decisions get here, the record should be well developed. The disputed issues ought to be narrow, limited, and in clear view. At this point, the Commissioner appears (for the first time as an adversary) to weigh in on whether the SSDI decision was right. Almost always, these appeals revolve around whether the ALJ decision should be upheld.

ALJ rulings in this context often provide detailed explanations of their decisions with voluminous records relevant to the issues. SSDI appeals are highly technical. And the lawyers who practice in this area (on both sides) know their stuff. The Court writes only for the parties. It knows they are knowledgeable about the record and law. So the Court only includes what is necessary to resolve the issues presented on appeal.

For instance, Rao takes no issue with the ALJ's conclusions at steps 1 through 3. The Court then need not discuss law or fact relevant to those issues. It presumes—without discussion—that these parties understand those steps in the SSDI context and the relevant facts below in support.

With it understood how the Court approaches this case, some context helps.

## Factual Background

Rao had severe substance abuse problems. There is no dispute about that matter. Nor is it contested that Rao is severely impaired when struggling with these issues. The problem, however, is that substance abuse is not a disability for the purpose of SSDI benefits. So for people like Rao, the inquiry becomes whether he would still be disabled after getting sober. 20 C.F.R. § 416.395(a)-(b)(1).

Separately from substances, Rao had other health concerns. The ALJ found severe impairments of "status post repair bilateral wrist lacerations and carpal tunnel release," "obesity," "mood disorder," "post-traumatic stress disorder," and "anxiety." (Doc. 10 at 25). This appeal mostly concerns limitations based on Rao's mental condition.

## Questions Presented

On appeal, Rao presents three questions:

> 1. Whether the [ALJ] erred in failing to adequately reflect in the residual functional capacity ("RFC") Plaintiff's limitations in interacting with others; concentrating, persistence, or pace; and adapting or managing himself as reflected in advanced practice registered nurse ("APRN") Dina Grodson's opinion which the ALJ found persuasive.
>
> 2. Whether the ALJ erred in evaluating Dr. Mark Giordano's opinion which indicated Plaintiff was disabled despite his substance abuse being in remission.
>
> 3. Whether the ALJ failed to identify jobs that comply with the RFC and that exist in significant numbers in the national economy.

(Doc. 11 at 1).

## Standard of Review

A "presumption of validity attaches" to the ALJ's factual findings; but a court must still review the ALJ's decision to "determine the reasonableness of the secretary's factual findings." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (citations omitted). To be sure, however, "No similar presumption of validity attaches to the Secretary's legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Id.* (citation omitted).

In an SSDI appeal, a judge "must review the agency's decision and determine whether its conclusion, as a whole, was supported by substantial evidence in the record." *Washington v. SSA*, 906 F.3d 1353, 1358 (11th Cir. 2018) (cleaned up). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). So "the ALJ's decision stands if its decision was based on such relevant evidence as a reasonable person would accept." *Flowers v. SSA*, 97 F.4th 1300, 1309 (11th Cir. 2024) (cleaned up).

"This threshold is 'not high,'" and "courts generally defer to the ALJ, 'who has seen the hearing up close.'" *Id.* (quoting *Biestek v. Berryhill*, 587 U.S. 97, 108 (2019)). So even if a judge "would have reached a different result and even if a preponderance of the evidence weighs against the Commissioner's decision," affirmance follows if the ALJ's decision "clears the low evidentiary bar" of substantial evidence. *Id.* (citation omitted); *see also Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).

Not only is this standard deferential; "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Washington*, 906 F.3d at 1358 (cleaned up). An SSDI appeal does not allow a judge "to decide the facts anew, make credibility determinations, or reweigh the evidence." *E.g.*, *Buckwalter v. SSA*, 5 F.4th 1315, 1320 (11th Cir. 2021); *see also Samuels v. SSA*, 959 F.3d 1042, 1045 (11th Cir. 2020); *Flowers*, 97 F.4th at 1306. At bottom, the simple task is to ask "whether on this record it would have been possible for a reasonable jury to reach the agency's conclusion." *Washington*, 906 F.3d at 1358 (cleaned up).

## Analysis

The Court takes each question presented in turn.

**1. RFC Challenge on Grodson**

Rao attacks the ALJ's decision regarding the RFC considering Grodson's opinions, which the ALJ found persuasive. He claims that the ALJ failed to account for Grodson's findings on certain mental limitations. Or, at a minimum, Rao questions if the ALJ provided sufficient explanation of the RFC compared against the persuasiveness finding regarding Grodson's opinions.

Grodson is a nurse. (Doc. 10 at 34). She provided mental health treatment to Rao between 2023 and 2025. *See* (Docs. 10 at 408; 10-1 at 63). During her treatment, Grodson filled out a mental RFC assessment. (Doc. 10 at 892-94). This assessment rated Rao as having occasional or mild deficits in seven mental functioning categories. (Doc. 10 at 892-93). Those areas follow:

> The ability to maintain attention and concentration for extended periods.
>
> . . .
>
> The ability to work in coordination with or proximity to others without being distracted by them.
>
> . . .
>
> The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
>
> . . .
>
> The ability to interact appropriately with the general public.
>
> . . .

> The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
>
> . . .
>
> The ability to respond appropriately to changes in the work setting.
>
> . . .
>
> The ability to travel in unfamiliar places or use public transportation.

(Doc. 10 at 892-93). As defined, "Occasional of Mild" deficits meant the inability "to perform for 10-33% of an 8 hour workday." (Doc. 10 at 892).

In every remaining functioning area (i.e., thirteen other categories), Grodson assessed Rao as having minimal or no deficits. (Doc. 10 at 892-93). As defined, "Minimal or None" meant the inability "to perform for 9% or less of an 8 hour workday." (Doc. 10 at 892).

At bottom, Grodson opined that Rao was not disabled when he "last stopped performing substantial and gainful work activity." (Doc. 10 at 893). After this RFC assessment, Grodson continued treating Rao for mental health issues.

A few months later, Rao saw Grodson. (Doc. 10-1 at 63-68). For that visit, Rao's aunts—who he lived with and financially depended on—came with "to discuss the mental [RFC] assessment." (Doc. 10 at 65). Apparently, Rao and his aunts took issue with Grodson's opinions. (Doc. 10 at 65). A record noted that Rao "requested transfer to [a] new provider due to dissatisfaction with [Grodson's] mental [RFC] assessment." (Doc. 10-1 at 734).

The ALJ considered Grodson's treatment and opinions. (Doc. 10 at 34-37). He noted that Grodson treated Rao during the relevant period before the last-insured date. (Doc. 10 at 37). What's more, the ALJ recognized that Grodson treated Rao over time following his hospitalization in late 2022. (Doc. 10 at 34-37). And the ALJ pointed to Grodson's records, which reflected some improvement on mood and depression issues with otherwise normal cognitive function. (Doc. 10 at 34-36). These records found support in other treatment notes. (Doc. 10 at 36). The ALJ further relied on a lack of medical records before Rao's hospitalization in November 2022—considering the alleged disability onset date of December 31, 2018. (Doc. 10 at 35).

With these facts in mind, the ALJ weighed Grodson's opinions against the other evidence in the record. (Doc. 10 at 36). Ultimately, the ALJ found that Grodson's assessment was consistent with the other evidence. (Doc. 10 at 36-37). The ALJ also found Grodson's opinion persuasive "*insomuch as* it supports [Rao] having no more than a moderate limitation in any of the *four areas of broad mental functioning* when [Rao] was not abusing substances." (Doc. 10 at 36) (emphasis added). The four broad areas (i.e., paragraph B criteria) are (1) "understand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4) "adapt or manage oneself." 20 C.F.R. 404.1520a(c)(3). In detail, the ALJ scrutinized Rao's functional abilities—based on the available record—and crafted the RFC. (Doc. 10 at 31-37). Along with certain physical RFC limitations, the ALJ provided an RFC capping Rao's mental

abilities at "simple instructions," "simple work-related decisions," "occasional changes in a routine," "occasional interaction with coworkers and supervisors," and "no interaction with the public." (Doc. 10 at 31).

As for the RFC crafting given Grodson's treatment and opinions, there is substantial evidence in the record to support the ALJ's decision.

Formulating the RFC is left to the ALJ. *Cooper v. Astrue*, 373 F. App'x 961, 962 (11th Cir. 2010) ("The task of determining a claimant's ability to work is within the province of the ALJ, not a doctor."). When making that decision, an ALJ must consider the medical evidence and may find provider opinions persuasive. *See* 20 C.F.R. § 416.945(a)(1), (3); *Beegle v. SSA*, 482 F. App'x 483, 486 (11th Cir. 2012). But she need not incorporate or adopt every portion of a medical opinion into an RFC—even those found persuasive. *E.g.*, 20 C.F.R. § 416.920c(a); *Massicotte v. SSA*, No. 8:20-cv-2923-MAP, 2022 WL 2663406, at *5 (M.D. Fla. July 11, 2022); *Stewart v. SSA*, No. 8:22-cv-968-JSS, 2023 WL 3815234, at *4-5 (M.D. Fla. June 5, 2023); *Hatchett v. Bisignano*, No. 3:24-cv-842-LLL, 2025 WL 3688808, at *8 (M.D. Fla. Sept. 18, 2025). "As long as the ALJ properly evaluated the medical opinion[,] . . . the only issue is whether substantial evidence support's [sic] the RFC assessment." *Sesler v. SSA*, No. 8:20-cv-2835-DNF, 2021 WL 5881678, at *6 (M.D. Fla. Dec. 13, 2021).

The Commissioner is correct that the ALJ was required to consider the medical evidence under 20 C.F.R. § 404.1520c. The most important factors of that analysis are the supportability and consistency of medical opinions. 20 C.F.R.

§§ 404.1520c(b)(2), (c)(1)-(2). The ALJ's decision discussed those factors and explained his ruling within the context of a detailed review of medical evidence on Rao's condition. That analysis specifically considered Grodson's opinions and treatment—with an explanation of why and how the ALJ found those matters persuasive to his RFC conclusions.

Contrary to Rao's assertions, Grodson's opinions were not found persuasive without discussion. The ALJ qualified his findings by saying Grodson's opinions were persuasive "insomuch as" (i.e., so far as, to the extent that, etc.) they indicate no more than moderate limitations in the paragraph B areas. (Doc. 10 at 36). The RFC accounted for those four categories by placing relevant limits on Rao's work abilities (e.g., concluding he could have no interaction with the public). (Doc. 10 at 31). These limitations roughly corresponded to the areas of occasional or mild deficits that Grodson found. *Compare* (Doc. 10 at 31), *with* (Doc. 10 at 892-93). What's more, the ALJ concluded that Grodson's treatment indicated improvement in Rao's mental condition with normal cognitive function and average judgment. (Doc. 10 at 36). And he credited Grodson's express opinion that Rao was not disabled when he stopped performing gainful work. (Doc. 10 at 36).

Where relevant, Rao's critiques misread the record. For instance, he offers this argument:

> Similarly, the RFC if Plaintiff stopped using alcohol or drugs permits occasional interaction with coworkers (Tr. 27) whereas APRN Grodson opined that for up to a third of the workday Plaintiff would be unable to work in coordination with or proximity to others without

> being distracted by them (Tr. 888). Thus Plaintiff's limitations on interacting with others are not adequately reflected in the RFC.

(Doc. 11 at 7). On this point, however, the RFC incorporated Grodson's opinions. In the SSDI context, a limitation on something occurring "occasionally" generally means "up to one-third of the time." *E.g.*, *D'Orazio v. SSA*, No. 6:16-cv-604-Orl-37DCI, 2017 WL 2122960, at *5 n.4 (M.D. Fla. Apr. 24, 2017); *Neville v. Astrue*, No. 1:10CV500-SRW, 2011 WL 2893642, at *3 (M.D. Ala. July 19, 2011); POMS DI 25001.001(A)(34). And most important, Grodson's assessment specifically defined "occasional or mild" as the inability to perform specific function for "10-33%" of a workday. (Doc. 10 at 892). So the RFC and Grodson came to identical conclusions on limitations like this one.

On review of the full record, the ALJ did not err in incorporating Grodson's opinions into the RFC. The ALJ evaluated the medical evidence—including Grodson's treatment and opinions. Then, he formulated an RFC in response to his factual findings about the evidence presented. And in the end, the RFC was supported by substantial evidence.

**2. RFC Challenge on Giordano**

Rao contests the ALJ's decision regarding Giordano's treatment and assessment of disability. He contends these matters were improperly addressed because Giordano rendered them during a time of substance abuse remission and claimed that Rao was disabled at the time of the last substantial, gainful work.

Giordano is a doctor. (Doc. 10 at 37). Rao saw him three times. (Doc. 10-1 at 730-38; Doc. 10-1 at 939-45; Doc. 10-1 at 1001-02). These visits were after Rao's benefits denial, reconsideration, and Appeals Council review. (Doc. 10 at 21). But they were within the weeks just before the ALJ hearing. (Doc. 10 at 21).

Even closer to the ALJ hearing, Giordano filled out a mental RFC assessment. (Doc. 10-1 at 984-86). This assessment rated Rao as having constant deficits in every possible category (i.e., twenty separate mental functioning areas). (Doc. 10-1 at 984-85). As defined, "Constant" deficits meant the inability "to perform for 90-100% of an 8 hour workday." (Doc. 10-1 at 984). And Giordano opined that Rao was disabled when he "last stopped performing substantial and gainful work activity." (Doc. 10-1 at 985).

The ALJ considered Giordano's treatment and opinions. (Doc. 10 at 37). He noted that Giordano first saw Rao one month before the assessment and over a year after the last-insured date. (Doc. 10 at 37). What's more, the ALJ recognized that Giordano did not treat Rao during the adjudication period. (Doc. 10 at 37).

With these facts in mind, the ALJ weighed Giordano's opinions against the other evidence in the record. (Doc. 10 at 37). Ultimately, the ALJ found that Giordano's assessment was inconsistent with—and unpersuasive against—the other evidence. (Doc. 10 at 37). Giordano failed to cite objective medical evidence or indicate what impact substance abuse had on Rao's functioning during the relevant time. (Doc. 10 at 37). The ALJ also found Grodson's more persuasive and consistent with relevant treatment records. (Doc. 10 at 37).

As for the treatment of Giordano's treatment and assessment, there is substantial evidence in the record to support the ALJ's decision.

The Commissioner is right that Giordano's opinions have little—if any—relevance to Rao's disability determination here. *E.g.*, *Hughes v. SSA*, 486 F. App'x 11, 14 (11th Cir. 2012) (Doctor opinions of disability after the date of "last insured" are "not particularly relevant to whether [plaintiff] was disabled for purposes of" SSDI); *Whitton v. SSA*, 643 F. App'x 842, 847 (11th Cir. 2016); *Mason v. SSA*, 430 F. App'x 830, 832-33 (11th Cir. 2011); *Hampton v. Kijakazi*, No. 8:20-cv-1654-CPT, 2021 WL 4473135, at *2 (M.D. Fla. Sept. 30, 2021) (collecting cases). Nothing in his assessment or treatment record makes any real effort to parse out Rao's severe substance abuse problems from any cognizable disability for SSDI purposes. There was simply no way for the ALJ to credit Giordano's opinion.

What's more, the ALJ detailed why he found Giordano's assessment unpersuasive. (Doc. 10 at 37). That explanation found Grodson's assessment to be more persuasive. (Doc. 10 at 37). And it was within the ALJ's province to weigh conflicting medical opinions based on the record evidence to decide. *E.g.*, *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir.1985) (An "ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." (citation omitted); *see also Edgecomb v. SSA*, 841 F. App'x 142, 144 (11th Cir. 2020) ("The ALJ may reject the opinion of any physician if the evidence supports a contrary conclusion."); *Huntley v. SSA*, 683 F. App'x 830, 832 (11th Cir. 2017). Rao wants the Court to reweigh the evidence—which it cannot do.

On review of the full record, the ALJ did not err in considering Giordano.

### 3. Step 5 Challenge

Finally, Rao questions whether the ALJ found enough jobs in the national economy that Rao could perform with his RFC. Condensed to the core, he takes issue with certain apparent conflicts between the RFC and identified jobs along with the estimated numbers of those positions.

The ALJ relied on vocational expert ("VE") testimony. (Doc. 10 at 38, 58-68). That testimony included a hypothetical covering the RFC addressed above. (Doc. 10 at 59-60). In response, the VE identified three positions: (1) mailroom clerk (SVP-2 and 56,000 jobs); (2) laundry sorter (SVP-2 and 31,000 jobs); and (3) marker (SVP-2 and 82,000 jobs). (Doc. 10 at 38, 61-62). The VE identified the data sources that he relied on—along with the method of calculating the number of jobs available. (Doc. 10 at 38, 63-64). What's more, the ALJ confirmed that the VE doesn't use job classification codes that possibly conflict with other systems, which could result in different results. (Doc. 10 at 38, 64-65).

On the question of the ALJ's step 5 conclusions, there is substantial evidence in the record to support the decision.

For a VE's "testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments." *Webster v. SSA*, 773 F. App'x 553, 555 (11th Cir. 2019). That testimony concerns whether work exists for claimant—despite the relevant RFC limitations—in sufficient

numbers. *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). "An ALJ may rely solely on the testimony of a VE in making this determination." *Webster*, 773 at 555.

There is no "minimum numerical count of jobs must be identified in order to constitute work that exists in significant numbers." *Atha v. SSA*, 616 F. App'x 931, 934 (11th Cir. 2015) (cleaned up). Instead, an "ALJ relying on the VE's testimony, determines whether a specific number of jobs constitutes a significant number." *Webster*, 773 at 555. Traditionally, the ALJ resolved apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). *Washington*, 906 F.3d at 1365. There is, however, no requirement for the ALJ to provide an express opinion resolving conflict between a VE and other statistical sources—like the Occupational Employment Statistics ("OES"). *Webster*, 773 at 555-56; *see also Smith-Russo v. SSA*, No. 2:18-cv-630-FtM-MRM, 2020 WL 13954613, at *5-6 (M.D. Fla. Mar. 11, 2020).

Rao's arguments fall short.

As the Commissioner contends, a reasoning level of two is not inconsistent with RFC limitations to "simple" instructions or decisions. *E.g.*, *Buckwalter*, 5 F.4th at 1323-24; *Hedges v. SSA*, 530 F. Supp. 3d 1083, 1093-96 (M.D. Fla. 2021) (collecting cases). While the mail clerk position has a DOT reasoning level of three, that does not change the outcome here. For starters, it is unclear whether there must still be an express conflict resolution since the Commissioner rescinded SSR 00-4p. *See* SSR 24-3p (Jan. 6, 2025) ("We are rescinding SSR 00-04p and will no longer require our adjudicators to identify and resolve conflicts between

occupational information provided by VSs and VEs and information in the DOT."). Decisions like *Washington* and *Viverette v. SSA*, 13 F.4th 1309 (11th Cir. 2021), are premised on the non-defunct administrative duty to provide express resolution.[1] There is also nothing about the DOT's mail clerk description suggesting that it involves duties that someone with Rao's RFC could not complete. *See, e.g.*, (Doc. 11-1 at 4) (explaining reasoning skills required for position). And finally, any error would be harmless because a significant number of other jobs exist with the remaining two positions. The ALJ expressly found either of those positions alone would offer enough opportunity for work. (Doc. 10 at 38). This differentiates *Viverette*. Based on this record, the Court cannot conclude the RFC limitations conflicted with the jobs identified by the VE.

Separately, the ALJ need not resolve any possible conflict arising between the VE's testimony and the non-DOT outside sources that Rao identifies. To the extent that any real conflict exists with SkillTran, Occupational Requirements Survey ("ORS"), or Occupational Employment and Wage Statistics ("OEWS")—which is doubtful—the ALJ was free to rely on the VE testimony without expressly explaining disagreement with those conflicting sources. *James v. Bisignano*, No. 24-0459-MU, 2026 WL 820863, at *5 (S.D. Ala. Mar. 25, 2026); *Horton v. Kijakazi*, No. 8:21-cv-435-WFJ-SPF, 2022 WL 3593917, at *1-2 (M.D. Fla. Aug. 23,

---

[1] Because Rao's claim was still pending after SSR 24-3p went into effect, that ruling applied to his case. *Fitzpatrick v. SSA*, No. 8:25-cv-00082-NHA, 2025 WL 3267998, at *4 n.2 (M.D. Fla. Nov. 24, 2025). Neither party sufficiently briefed this major change. So each side waived any argument on how SSR 24-3p impacts the conflict between the VE and DOT.

2022); *Koehler v. SSA*, No. 2:22-cv-210-JES-KCD, 2022 WL 18672970, at *5 (Nov. 10, 2022); *Acosta v. O'Malley*, No. 23-cv-21426-BLOOM/Damian, 2024 WL 2888903, at *4-5 (S.D. Fla. June 10, 2024). The VE explained the sources he used and confirmed those did not include the ORS. (Doc. 10 at 63, 67-68). No further testimony from the VE was needed regarding the other sources.

Rao is right that the rules have recently changed. So VEs may rely on these other sources and could need to provide different explanations depending on their testimony (e.g., parsing out Standard Occupational Classification ("SOC") differences with the DOT). SSR 24-3p. Yet the VE's testimony below explained his reliance on both the DOT and SOC. (Doc. 10 at 67). And it clarified that any possible overcounting for something like part-time work was not—under the VE's methodology—"statistically significant with respect to the total numbers." (Doc. 10 at 67).

What's more, nothing suggests that the evidence that Rao cites was ever submitted to the ALJ. Nor was there a proper objection noted. Rao apparently submitted these matters to the Appeals Council—not the ALJ. (Doc. 10 at 279-384). This easily distinguishes situations where a claimant submits a post-hearing memorandum to an ALJ with evidence rebutting VE's testimony. *See Roth v. SSA*, No. 6:20-cv-550-MRM, 2021 WL 4399125, at *6-9 (M.D. Fla. Sept. 27, 2021). So the challenge here—that the ALJ committed an error based on argument and evidence that he never heard—necessarily fails. *Ingram v. SSA*, 496 F.3d 1253,

1266 (11th Cir. 2007); *Lawton v. SSA*, 431 F. App'x 830, 832 (11th Cir. 2011); *Koehler*, 2022 WL 18672970, at *6.

As for the attack on the marker position's obsolescence, the Court agrees with its colleagues. *Amones v. SSA*, No. 2:25-cv-1130-SJH, 2026 WL 2137298, at *5 (M.D. Fla. July 24, 2026). It won't declare that jobs don't exist based on uneducated guesswork. *Roper v. Dudek*, No. 6:25-cv-226-CEM-DCI, 2025 WL 3036536, at *2 (M.D. Fla. Oct. 1, 2025), *R&R adopted*, 2025 WL 3034788 (Oct. 30, 2025). Nor will it reweigh evidence in the ALJ's place.

After review, the ALJ did not err at step 5.

## Conclusion

For those reasons, the Court answers each question presented in the negative. The ALJ's decision was supported by substantial evidence. To the extent the ALJ could have explained something more clearly, Rao failed to show a harmful error. So the Court affirms the denial of Rao's SSDI benefits.

**ORDERED:**

1. Defendant's decision is **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

2. The Clerk must **ENTER** judgment in Defendant's favor, terminate any motions or deadlines, and close the case.

In Fort Myers, Florida, on September 11, 2026.

Kevin R. Huguelet
United States Magistrate Judge